No. 83-321

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

HENRY CALVIN CANON,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Charles Luedke, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Moses Law Firm, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana

Submitted on Briefs: March 8, 1984

Decided: August 30, 1984

Filed: AUG 30 1984

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant Calvin Henry Canon (Canon) was arrested on December 9, 1981 with approximately thirty pounds of marijuana in his possession. On December 15, 1981, Canon was charged in Yellowstone County District Court with criminal possession of dangerous drugs with intent to sell, a felony. Canon's arrest was the result of an undercover drug operation in which the Yellowstone County authorities were assisted by Canon's accomplice, Lois Ruland (Ruland). On February 8, 1983, defendant was found guilty of criminal posession with intent to sell. On April 19, 1983, Canon was fined $15,000 and sentenced to 15 years in prison. We affirm his conviction.

The issues on appeal are:

1. Were the Kentucky telephone tapes properly admitted in evidence?

2. Was certain testimony of Detective Hirschi improperly admitted hearsay evidence?

3. Was evidence of other crimes improperly admitted?

4. Was accomplice Ruland's testimony adequately corroborated?

5. Was entrapment established as a defense?

6. Was the jury properly instructed on unanimous jury verdict and specific intent?

7. Was a new trial warranted because of accomplice Ruland's letter?

8. Were Canon's automobile keys illegally seized and admitted into evidence?

Canon is 51, married and has three grown children. He and Lois Ruland had a 3 year relationship during which they talked of his divorce and marriage to Ruland, but that

2

relationship was terminated. Ruland threatened to get even with him.

In November of 1981, Detective Hirschi of the Yellowstone County Criminal Investigation Division (CID) contacted Ruland at a bar in Billings. Hirschi advised Ruland that he had information she was involved with the Billings drug traffic and asked her to assist in gathering evidence against the leaders of the drug organization in return for immunity from prosecution. Ruland agreed.

Ruland kept Hirschi informed of plans for her next trip to Lexington, Kentucky to pick up marijuana. This was the site chosen by the people involved in the drug organization. Neither Hirschi nor any other member of the CID made the plans for the drug purchase and sale. The plans were made and completed by Ruland, defendant Canon, and those with whom they were working. The CID took pictures of the two suitcases which Ruland took to Kentucky for use in transporting the marijuana. Hirschi accompanied Ruland to Kentucky and asked Kentucky police for assistance. Ruland testified that defendant was involved with the plans for the December 7, 1981 trip to Kentucky and provided money needed to obtain the marijuana and to cover Ruland's expenses.

Ruland testified that prior to the trip to Kentucky, she set aside $13,000 of the $17,400 payment she was to make for the drugs in Kentucky. She intended to take the money and her children and "disappear" from the defendant, the drug organization, and the CID as well.

Problems arose in Kentucky because Ruland did not have the necessary $17,400. A number of telephone calls were made between Ruland in Kentucky and Canon in Montana, which were recorded by Hirschi and the Kentucky police. Finally the

3

necessary funds were obtained and the transaction was completed.

Ruland and Hirschi returned to Billings via Denver, Colorado on December 8, 1981. The airline failed to transfer Ruland's bags which contained the marijuana. When Ruland picked up the two bags containing marijuana at the Billings airport, on December 9, 1981, she was followed by defendant Canon, who stopped her and had her follow him to a parking lot in Billings. The testimony of CID officers and Ruland established that Canon there demanded one of the suitcases containing marijuana and left the scene. Canon was arrested a short time later with the suitcase and approximately 30 pounds of marijuana in his possession.

Defendant testified that he knew none of the people involved in the drug transactions in Florida, Kentucky or Montana. He specifically denied that he had been in any way involved in the sale of drugs or any other type of drug transaction with Ruland. Other pertinent facts will be presented in our discussion of the issues.

I

Were the Kentucky telephone tapes properly admitted in evidence?

Defendant Canon's motion to suppress tape recordings of telephone conversations in Kentucky was denied by the District Court. Detective Hirschi testified that the telephone conversations between Ruland and Canon were recorded with Ruland's consent by a cassette tape recorder with a suction-type plug, which was attached to the receiver of the telephone used by Ruland.

Defendant Canon's contention is that the State should have applied for and obtained court permission to electronically survey and tape the conversations between

4

Canon and Ruland, and that such court permission should have been sought in Montana under the requirements of Montana cases. Canon cites a number of Montana cases which establish that tape recordings and transcriptions obtained through the use of an unauthorized electronic monitoring device may properly be suppressed on constitutional grounds. State v. Hanley (1980), 186 Mont. 410, 608 P.2d 104; State v. Brackman (1978), 178 Mont. 105, 582 P.2d 1216.

Defendant does not discuss the taping of a telephone conversation where one party to the conversation has consented to the taping. Here Detective Hirschi testified that Ruland had consented to the monitoring and tape recording of the telephone calls. That testimony was not challenged in any manner on cross-examination or otherwise. Ruland testified at length and was extensively cross-examined. She specifically testified that she had consented to the recording. She also testified that she was not coerced or pressured in any way into allowing the recordings to be made. We note that the tapes contain damaging evidence in that they tend to prove defendant's involvement in drug transactions, of which he denied having any knowledge.

This issue has been settled in Montana. As this Court stated in State v. Coleman (Mont. 1980), 616 P.2d 1090, 1096, 37 St. Rep. 1664, 1668:

> "The answer to (defendant) Case's contention here is again found in Hanley, supra, where we held that interception of telephone conversations by police officers is legal if one of the parties to the conversation consents, even an informer. This Court has never held that a court order is necessary to monitor a telephone conversation, where one of the parties to the telephone conversation consents. . .. Neither party to a telephone conversation can ordinarily see the other. Neither has any way of knowing whether or not the conversation on the telephone is being overheard by other parties. Neither the Montana

5

nor the federal constitution prohibits such monitoring where one of the participants consents. See 18 U.S.C. § 2511(2)(c)."

We hold that the Kentucky telephone tapes were properly admitted in evidence.

## II

Was certain testimony of Detective Hirschi improperly admitted hearsay evidence?

Detective Hirschi testified on the first day of trial. At that time, Lois Ruland was not available. Neither the State nor the defendant knew whether or not she would be present to testify. Detective Hirschi testified on the question of the consent of Lois Ruland in order to meet the standard that a telephone conversation can be monitored where one of the parties consents. Coleman, 616 P.2d at 1096, 37 St.Rep. at 1668. In substance defendant contends that there was no way to prove the consent of Lois Ruland through Officer Hirschi, except by proving the truth of her statements, which are clearly hearsay and therefore inadmissible.

The key points are contained in the questions and answers between the Court and Officer Hirschi prior to the playing of the questioned tapes of the telephone conversations:

"The Court: Preliminary, Mr. Hirschi, I want to ask you, were you present at the time both of these tapes were taken?

"A. Yes, I was.

"The Court: And was Lois Ruland aware that the conversations were being taped?

"A. Yes, she was.

"The Court: And it was done with her agreement?

"A. That's correct.

"The Court: And her consent.

6

"A. Yes, sure."

Our initial inquiry is whether or not the foregoing statements by Hirschi constitute hearsay testimony.

Hearsay is defined in Rule 801(c), M.R.Evid.:

> "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The declarant is the person who makes the statement. Rule 801(b), M.R.Evid. Here, Lois Ruland was the declarant. The essence of the challenged testimony of Detective Hirschi is that Ruland was aware the conversations were being taped and that the taping was done with her consent. This testimony established the fact of an agreement between Hirschi and Ruland. It is important to note that Hirschi did not testify as to any statement made by Ruland. We conclude that by definition, the testimony to which objection is made was not hearsay.

Even if we accepted the defendant's contentions that the testimony constituted hearsay, no reversible error was committed. Several days later, Lois Ruland did testify and was cross-examined at length by defense counsel. Her testimony established that she consented to the taping and that there was no coercion in that consent. As a result, the defendant had all of the necessary opportunity to protect himself by cross-examination of Ruland. No prejudice has been demonstrated by the defendant.

We hold that the testimony of Detective Hirschi was properly admitted.

III

Was evidence of other crimes improperly admitted?

Defendant contends there were many instances where evidence of other crimes was presented to the jury. Without

7

discussing specifics, he makes many transcript references and then notes, as an example of the improper evidence, the following testimony on the part of Lois Ruland:

"Q. Lois, who was at the top of the Yellowstone County organization on December 9, 1981?

"A. Cal Canon."

Defendant argues that he was not charged with being the head of the entire Yellowstone County drug organization and that the testimony was therefore prejudicial.

In summary, the various references to the transcript were to testimony by Ruland of Ruland's other trips carrying drugs, of other drug deals in which the defendant was involved with Ruland, of the tie-in between defendant and various members of the Florida drug organization, and of defendant's threats of bodily injury to Ruland and others if she left the drug organization. Defendant argues that there was a failure on the part of the State to meet the procedures mandated by State v. Just (1979), 184 Mont. 262, 602 P.2d 957.

The testimony clearly falls within the corpus delicti rule stated in State v. Gillham (Mont. 1983), 670 P.2d 544, 549, 40 St.Rep. 1576, 1581:

"This Court has recognized that the State is entitled to 'present the entire corpus delecti [sic] of the charged offense including matters closely related to the offense and explanatory of it . . .' This rule overrides the requirements of Just. State v. Riley (1982), Mont. 649 P.2d 1273, 1279, 39 St.Rep. 1491, 1499."

The rationale supporting admissibility of this testimony as part of the corpus delicti is directly comparable to that stated in State v. Frates (1972), 160 Mont. 431, 437, 503 P.2d 47, 50:

"The evidence of the two prior sales of LSD to the informer in the instant case is part of the corpus delicti of the crime with which the defendant is charged. It is a part of the totality of events

8

and occurrences leading to and culminating in the sale of 900 LSD tablets to the undercover police officer . . . It tends to explain the circumstances leading to the commission of the crime charged, establishes defendant's intent to commit the crime charged, and negatives the defense of entrapment. As such, it is clearly relevant, probative and competent evidence tending to prove the crime charged."

We hold that the evidence in question was properly admitted as relative, probative and competent evidence tending to prove the crime with which defendant was charged.

IV

Was accomplice Ruland's testimony adequately corroborated?

Defendant argues that there was insufficient corroboration of accomplice Ruland's testimony, as required under section 46-16-213, MCA. We find it difficult to view this contention seriously.

The tape recordings in and of themselves constitute sufficient evidence to corroborate the testimony of Ruland. In addition, the evidence showed that defendant was arrested with approximately 30 pounds of marijuana in his possession; that the defendant's key ring contained keys which opened the suitcase containing the marijuana; that phone records verified thirteen long-distance calls charged to defendant's home during the drug transaction, five of which were made to Florida and corroborated Ruland's explanation of the drug transaction.

We hold there is more than sufficient corroborative evidence to meet the standards of section 46-16-213, MCA.

V

Was entrapment established as a defense?

Defendant argues that the evidence established entrapment as a matter of law in that Ruland acted as an agent of the State to induce the defendant to commit the

9

offense. He claims that the behavior of the officers was a violation of due process of a magnitude that shocks the conscience and therefore has reached constitutional proportions. We do not agree.

Section 45-2-213, MCA provides:

"Entrapment. A person is not guilty of an offense if his conduct is incited or induced by a public servant or his agent for the purpose of obtaining evidence for the prosecution of such person. However, this section is inapplicable if a public servant or his agent merely affords to such person the opportunity . . . for committing an offense in furtherance of criminal purpose which such person has originated."

In State v. Kamrud (Mont. 1980), 611 P.2d 188, 191, 37 St.Rep. 933, 937, we stated:

"'This statute is consonant with earlier decisions of this Court which set forth the following elements of entrapment: (1) Criminal intent or design originating in the mind of the police officer or informer; (2) absence of criminal intent or design originating in the mind of the accused; and (3) luring or inducing the accused into committing a crime he had no intention of committing. [citations omitted]' State v. Grenfell, supra, 564 P.2d at 173."

. . .

"This Court has on previous occasions discussed in detail the matters to be considered in determining whether or not the entrapment defense has been established:

'Entrapment occurs only when the criminal intent or design originates in the mind of the police officer or informer and not with the accused, and the accused is lured or induced into committing a crime he had no intention of committing. . . . In short, there is a controlling distinction between inducing a person to do an unlawful act and setting a trap to catch him in the execution of a criminal design of his own conception . . .' State v. Karathanos (1972), 158 Mont. 461, 493 P.2d 326, 331."

No evidence was presented showing that the criminal intent or design in this case originated in the mind of a police officer or informer. There is extensive evidence connecting defendant to the drug transaction, but none shows

10

that the intent or design originated with the police officer or informer. The officers at most afforded to the defendant the opportunity to commit a crime. This by definition makes the entrapment statute (section 45-2-213, MCA) inapplicable. The evidence also fails to show an absence of criminal intent originating in the mind of the defendant. Lastly, there is no evidence of any luring or inducing the defendant into committing a crime which he had no intention of committing. The facts do not substantiate the defendant's contention of entrapment.

At trial the defendant denied any knowledge of the contents of the suitcases or involvement in the drug transaction. That defense is actually inconsistent with the theory of entrapment, which he now argues. Notwithstanding that inconsistency, defendant was given the benefit of instructions on entrapment in a manner similar to that in Kamrud.

In Kamrud, we also stated that the entrapment defense is not a constitutional defense, citing the United States Supreme Court's conclusion in United States v. Russell (1973), 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366. Defendant attempts to argue that the behavior of the officers was of such a magnitude as to shock the conscience and obtain constitutional proportions. The evidence fails to support that contention.

We conclude that there is no constitutional issue of entrapment, and that the defense of entrapment was not established by the evidence.

VI

Were the jury instructions on unanimous jury verdict and specific intent proper?

11

Defendant argues that the jury should have been given an instruction requiring a unanimous verdict on the alternative mental states of "purposely" and "knowingly." He asserts he is entitled to a specific verdict on the theory under which he was convicted.

This Court has on three recent occasions rejected such arguments. The same contentions made here by the defendant were rejected in State v. Warnick (Mont. 1982), 656 P.2d 190, 194, 39 St.Rep. 2369, 2374-75. We will not restate the contentions and holdings which are adequately set forth in that opinion. See also McKenzie v. Osborne (1981), 195 Mont. 26, 43-44, 640 P.2d 368, 378-79 and Fitzpatrick v. State (Mont. 1981), 638 P.2d 1002, 1011-12, 38 St.Rep. 1448, 1457-58.

We hold that adequate instructions were given and that defendant was not entitled to any additional instruction regarding a unanimous jury verdict on alternative mental states.

Defendant also argues that the refusal of proposed instructions on required mental state was improper. We disagree. Defendant's proposed instructions No. 18 and 20 were adequately covered by other instructions in the case.

Defendant contends that three additional instructions covering deliberate intent and specific intent should have been given. An extensive discussion of intent is contained in this Court's opinion in State v. Starr (Mont. 1983), 664 P.2d 893, 897-98, 40 St.Rep. 796, 801-02. Under the law as stated in that opinion, the instructions on specific intent and deliberate intent were not appropriate. We hold that the instructions as given by the District Court properly described intent.

Was a new trial warranted because of the Ruland letter?

Defendant contends that a new trial should have been granted based upon a letter sent by Ruland to the trial court and an affidavit which she executed, together with her testimony at a hearing on the motion for a new trial. In substance, defendant argues that the jury should have heard Ruland's testimony which indicates that the CID officers allowed her to sell marijuana in order to finance her trip to Lexington, Kentucky. Defendant argues that this evidence affects the credibility of Ruland and also the CID investigator.

The newly discovered evidence must meet the requirements set forth in State v. Greeno (1959), 135 Mont. 580, 342 P.2d 1052. Because we find that the evidence clearly does not meet the tests set forth in Greeno, we will not discuss it at length.

The affidavit, letters and testimony only bring additional evidence contradictory in nature so far as Ruland is concerned. In a portion of that evidence, she indicates knowledge on the part of Detective Hirschi. In the course of her oral testimony, she contradicted that writing and stated that the officers could not have known of the sale. In substance, it appears that the "new" evidence contains additional contradictions. The trial transcript discloses that there were contradictions in Ruland's testimony which were adequately brought out on both direct and cross-examination. With the exception of the one element contained in her letter, her entire trial testimony would have been the same.

The "new" evidence only presents an additional inconsistency for consideration by the jury. This evidence

is actually not material as an element of the offense under the rule of Greeno.

We hold that a new trial was not warranted because of the Ruland letter.

VIII

Were Canon's automobile keys illegally seized and admitted into evidence?

Defendant was properly arrested by Deputy Jensen. After the arrest, Jensen took possession of the defendant's automobile, which defendant had been driving immediately prior to arrest. Jensen drove the automobile to the basement of the Yellowstone County Courthouse and turned the car keys over to the property officer for Yellowstone County CID. A search warrant was then obtained for the search of the automobile. In the course of executing that warrant, defendant's keys were used first to unlock the trunk of his automobile and second to unlock the suitcase, which was in the trunk and contained approximately 30 pounds of marijuana. Defendant asserts that without a valid search warrant describing the keys, there was no authority for the State to seize the keys and admit them into evidence.

Defendant cites only general cases with regard to searches and seizures. He does not cite any case having a comparable fact situation.

Section 46-5-101, MCA, sets forth the general standard for a search incident to arrest:

> "Searches and Seizures - When Authorized. A search of a person, object, or place may be made and instruments, articles, or things may be seized in accordance with the provisions of this chapter when the search is made:
>
> "(1) as an incident to a lawful arrest; . . ."

The facts demonstrate that the keys were actually in the ignition at the time of arrest. The officer correctly took

14

possession of the defendant's automobile following the arrest. The car keys were properly turned over to the property officer. Up to that point, it is clear that the car keys came into the possession of the authorities as an incident to a lawful arrest. No search was necessary.

The keys themselves merely provided the State with access to the interior of the trunk and to the interior of the suitcase. Only after their use did it become apparent that the keys were significant as evidence because one of defendant's keys opened the suitcase containing the drugs.

We hold that the seizure of the keys was properly made as an incident to a lawful arrest, and that, having been lawfully seized, such keys were admissible as evidence in any prosecution. See State v. Armstrong (Mont. 1980), 616 P.2d 341, 349, 37 St.Rep. 1563, 1570.

The conviction of defendant Canon is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

15